# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **RAYMOND LINDSEY**, | Case No. 3:14-cv-485-SI |
| Plaintiff, | **OPINION AND ORDER** |
| v. | |
| **CLATSKANIE PEOPLE'S UTILITY DISTRICT**, | |
| Defendant. | |

Aaron W. Baker, Attorney at Law, 888 SW Fifth Avenue, Suite 650, Portland, OR 97204;
Robert K. Meyer, Attorney at Law, P.C., 888 SW Fifth Avenue, Suite 650, Portland, OR 97204.
Of Attorneys for Plaintiff.

Karen M. O'Kasey and Mark C. Sherman; HART WAGNER, LLP, 1000 SW Broadway, Suite
2000, Portland, OR 97205. Of Attorneys for Defendant.

**Michael H. Simon, District Judge.**

Plaintiff Raymond Lindsey ("Lindsey") has sued his former employer, Defendant

Clatskanie People's Utility District ("CPUD"), for religious discrimination in violation of federal

and state civil rights laws, retaliation in violation of federal and state civil rights laws,

whistleblower relation in violation of state whistleblower laws, and wrongful discharge under

state common law. Lindsey concedes CPUD's motion for summary judgment on his religious

discrimination claims. For the reasons that follow, the Court denies CPUD's motion for

PAGE 1 – OPINION AND ORDER

summary judgment on Lindsey's retaliation claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-5, and Oregon Revised Statute ("ORS") § 659.030. The Court grants CPUD's motion for summary judgment on Lindsey's whistleblower retaliation claims and common law wrongful discharge claim.

## STANDARDS

A party is entitled to summary judgment if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the burden of establishing the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The court must view the evidence in the light most favorable to the non-movant and draw all reasonable inferences in the non-movant's favor. *Clicks Billiards Inc. v. Sixshooters Inc.*, 251 F.3d 1252, 1257 (9th Cir. 2001). Although "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ruling on a motion for summary judgment," the "mere existence of a scintilla of evidence in support of the plaintiff's position [is] insufficient . . . ." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 255 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation and quotation marks omitted).

## BACKGROUND[1]

CPUD hired Lindsey as an Information Technology ("IT") Supervisor in March 2011. Dkt. 27-1 at 2. Lindsey signed an Employee Acknowledgment Form, stating that he

---

[1] As described more fully below, the Court has reviewed the portions of Robert Meyer's declaration to which Defendant objects and considers only admissible evidence in deciding CPUD's motion for summary judgment. These facts are presented in the light most favorable to the non-moving party.

acknowledged "that the computers, telephones, software, e-mail, internet use and equipment are the property of the District, therefore workplace monitoring, surveillance of non-private workplace area may be conducted by the District." Dkt. 24-6 at 1. Greg Booth served as General Manager of CPUD at the time of Lindsey's hire and continued to do so for the duration of Lindsey's employment at CPUD. Dkt. 27-2 at 2. Booth promoted Lindsey to IT Manager in February 2012 and then to IT Director in January 2013. Dkt. 27-3 at 2. Each of Lindsey's promotions came with a pay increase. Dkt. 27-1 at 2-3.

The promotions and raises ended in May 2013. On May 7, CPUD placed Lindsey on administrative leave. Dkt. 24-4 at 12. On May 14, Lindsey received a letter notifying him of a pre-disciplinary meeting to determine if he had violated CPUD policies. Dkt. 24-8 at 1. On May 17, Lindsey attended the meeting, and CPUD terminated his employment the same day. *Id.*; Dkt. 24-9 at 1.

The parties disagree about the events that led to Lindsey's termination. Lindsey asserts that CPUD fired him for opposing and reporting, in good faith, what Lindsey believed to be illegal employment practices by CPUD. According to Lindsey, his termination was part of a larger pattern or practice of retaliating against employees who opposed and reported sexual harassment by former CPUD employee Joe Taffe or other unlawful activity at CPUD. In response, CPUD states that it discharged Lindsey "for insubordination, inappropriate conduct as a Department Director, withholding critical information from [his] supervisor, violating direct orders, dishonesty, approving unauthorized expenses, deleting public records, and divulging confidential information." Dkt. 24-9 at 1. Of central importance to the parties' dispute are the conduct of Taffe and the response of General Manger Booth.

**A.  Complaints Regarding Joe Taffe**

At the time Lindsey began working at CPUD, Taffe served as CPUD's Energy Manager. Dkt. 27-10 at 2.  Taffe and Booth worked closely—Taffe described himself as Booth's "biggest supporter." Dkt. 27-2 at 19; Dkt. 27-10 at 7-8.

In March of 2011, Booth received complaints from two female CPUD employees, Elisha Shulda and Gail Rakitnich, concerning Taffe. Dkt. 24-2 at 3. Shulda alleged that Taffe groped her in one of her coworker's offices. Dkt. 24-2 at 3. Rakitnich alleged that at a company bowling party, Taffe groped her from behind as he walked by her. Dkt. 27-2 at 51.

By April 2011, two more female employees, Sarah Blodgett and Tami Keith, had reported to Booth that Taffe inappropriately touched them. Dkt. 27-5 at 16-20. Booth did not fire, suspend, or place Taffe on administrative leave in response to the complaints. Dkt. 27-2 at 4-5. Booth's two disciplinary actions were to place Taffe on "probation" and issue a sealed letter of reprimand to Taffe's personnel file. Dkt. 24-2 at 3; Dkt 27-5 at 17.

In December 2011, Booth received a report of another incident between Shulda and Taffe. Dkt. 27-6 at 41-45. According to Shulda and other witnesses, Taffe called Shulda a derogatory name and told his coworkers that "we should just kill her." Dkt. 27-13 at 5. In response to this complaint, Booth allowed Taffe to retire and continue working for CPUD under a consulting agreement that paid Taffe $7,800 per month. Dkt. 27-5 at 42; Dkt. 27-6 at 49-50.

In February 2012, Shulda and Rakitnich filed complaints with the Bureau of Labor and Industry ("BOLI") concerning Taffe's behavior. Dkt. 27-11 at 1-4. Between December 2011 and February 2012, Shulda, Rakitnich, and Keith also reported Taffe's behavior to the Clatskanie Police Department. Dkt. 27-2 at 22-45. Booth allowed Taffe to continue performing contract work for CPUD and occasionally visiting the CPUD facilities until approximately September 2012. Dkt. 27-5 at 51-54; Dkt. 27-6 at 51.

PAGE 4 – OPINION AND ORDER

**B.  Booth's Ongoing Responses to the Complaints**

By December 2012, Booth knew that Shulda and Rakitnich had filed complaints with BOLI and the Clatskanie Police Department concerning Taffe. Dkt. 27-2 at 13; Dkt. 27-7 at 3-4. Booth knew that Keith had made reports to the police about Taffe as well. *Id.* According to Becky Rakoz, Booth's executive assistant, Booth began talking to her about firing the women who had complained. *Id.* Rakoz reported Booth's comments to CPUD's legal counsel, and Booth discovered that Rakoz had made this report. Dkt. 27-7 at 3; Dkt. 27-14 at 4-5, 8. Lindsey asserts that Booth also talked to him about the complaints and Booth's desire to know where BOLI obtained its information. Dkt. 27-1 at 11.

In January 2013, Keith filed a charge with the Equal Employment Opportunity Commission ("EEOC") against CPUD. Dkt. 27-12 at 1. Keith took a medical leave of absence while her EEOC charge was pending. Dkt. 27-1 at 10. During Keith's absence, Booth became aware of her EEOC charge and, according to Lindsey, talked to Lindsey about searching Keith's work computer. Dkt. 27-2 at 11-12; Dkt. 27-1 at 8. Lindsey asserts that in April 2013, Booth specifically told Lindsey that he wanted Lindsey to search Keith's computer for evidence "to get rid of her." Dkt. 27-1 at 8-9. Lindsey had contact with Keith and knew the nature of her claims against CPUD. Dkt. 28 ¶¶ 2-5. Believing that this broad search of an employee's computer would be illegal and possibly lead to a destruction of evidence, Lindsey claims he refused to conduct the search. Dkt. 27-1 at 8-9. According to Lindsey, "When I talked to the BOLI instructor [from a training], they [sic] told me if you have something specific to search for . . . that pertains to a particular subject, then you could look for it, but just to go do a blanket search is just a witch hunt." *Id.* at 9. Booth denies ever asking Lindsey to perform this search. Dkt. 27-3 at 4. Booth asserts that the only employee computer that he ever asked Lindsey to search was Rakitnich's after she left CPUD. Dkt. 24-4 at 6-7.

Lindsey further asserts that in April 2013, Booth asked him to "scrub" Booth's computer. Dkt. 27-1 at 7-8. According to Lindsey, he had a similar conversation with Booth the previous year in which Booth told Lindsey that Booth had another IT employee hide evidence during an administrative investigation. Dkt. 27-1 at 7. Lindsey recalls Booth telling him that he "may be called to do the same in the future." *Id.* Lindsey asserts that in response to Booth's April 2013 request, he asked Booth for a letter from legal counsel authorizing a wipe of the computer. Because Lindsey never received such a letter, he never performed the requested scrub. *Id.* at 8.

Also in April 2013, Booth discovered an email from Keith to Lindsey and five other CPUD employees. Dkt. 27-3 at 5; Dkt. 28 at 4. The email concerned BOLI investigators contacting CPUD employees regarding the complaints against Taffe. Dkt. 28 at 4. Lindsey had chosen not to forward the email to Booth in the same manner that Lindsey forwarded Booth a previous email concerning BOLI investigations. Dkt. 27-3 at 5. Lindsey claims he did not bring the email to Booth's attention for fear that Booth would retaliate against either him or Keith. Dkt. 28 ¶¶ 2, 5.

After Lindsey's refusals to search or scrub CPUD computers and the discovery of the Keith email, Booth hired a forensic expert to search Lindsey's computer. Dkt. 27-3 at 11. Booth acknowledges that the discovery of Keith's email to Lindsey motivated Booth to hire the forensic expert to investigate Lindsey. Dkt. 27-3 at 7-8. Booth also requested that the forensic expert search the computers of Shulda, Keith, and Rakoz. Dkt 27-3 at 11, 23.

## C. Employee Terminations

The search of employee computers revealed text messages and emails between multiple CPUD employees expressing frustration with the work environment created by Taffe and Booth. Dkt. 24-3 at 10-11; Dkt. 27-2 at 7-10, 20-21. The search also revealed that Lindsey called Booth an offensive name in a text message exchange with another employee and that Lindsey had

extensive contact with Keith during her medical leave. Dkt. 24-1 at 13-15; Dkt. 24-3 at 10-11.

Before the discovery of the texts and emails, a Human Resources administrator, Debbie Throop,

had directed Lindsey to refrain from contacting Keith during her medical leave. Dkt. 24-1 at 13;

Dkt. 24-3 at 5-6; Dkt. 27-5 at 3. Some of the text messages between Lindsey and Keith

concerned the alarm at the CPUD facilities and what times it would be active. Dkt. 24-1 at 15.

Throop states that the emails and texts revealed that Lindsey also shared information about an

intern's grades with Keith. Dkt. 24-3 at 9.

      Booth admits that he made the decision to fire Lindsey on May 10, 2013, a week before a

meeting purportedly to discuss with Lindsey possible disciplinary actions. Dkt. 27-3 at 12.

According to Booth, he was concerned about Lindsey's "loyalty . . . and the security of all the

information to which [Lindsey] had access." Dkt. 24-4 at 8. The email from Keith to Lindsey

also had "some impact" on Booth's decisions leading up to, and including, Lindsey's

termination. Dkt. 27-3 at 8, 18-20. In her deposition, Throop, who reviewed Lindsey's

termination letter from Booth and participated in the disciplinary meeting, gave the following

reasons for Lindsey's termination: (1) having unauthorized contact with Keith and sharing

confidential information with her; (2) deleting at least one email from Keith's inbox at Keith's

request; (3) failing to be truthful about his contact with Keith; (4) signing a contract with a web

development company that Booth had not authorized; (5) sending offensive text messages and

emails about Booth; (6) failing to work in an open and direct manner with Booth; (7) failing to

bring issues to Booth's attention;  (8) taking home Booth's and Throop's hard drives; and

(9) failing to apologize for his actions. Dkt. 24-3 at 7-14. Lindsey asserts that at the time of his

termination, no one at CPUD knew that he had the hard drives, which he had taken home so

Booth would not destroy evidence. Dkt. 27-1 at 4-5.

An array of disciplinary actions against other CPUD employees followed Lindsey's termination. On May 31, 2013, Booth placed Keith on administrative leave. Dkt. 27-4 at 2. CPUD terminated Keith on June 17, 2013. *Id.* at 1. Booth placed Rakoz on administrative leave on June 11, 2013. Dkt. 27-6 at 67. CPUD fired Rakoz on July 19, 2013. Dkt. 27-6 at 96. CPUD also eventually fired Shulda and Blodgett as a result of the investigation into employee texts and emails. Dkt. 24-3 at 3-4, 9. Rakitnich had already resigned in February 2013, the same month that BOLI issued a Notice of Substantial Evidence Determination in her case and Shulda's case. Dkt. 27-6 at 22-25, 29-33; Dkt. 32 at 7, 15. Brian Fawcett, a witness to Taffe's threat against Shulda, was placed on administrative leave for three weeks without pay. Dkt. 27-13 at 2-3, 6; Dkt. 27-5 at 89-91. Similarly, Barbara Haas, an employee who had been involved in the emails concerning BOLI, was placed on unpaid administrative leave. Dkt. 27-5 at 91-93; Dkt. 27-8 at 2; Dkt. 28 at 4.

**DISCUSSION**

**A.  Retaliation Claims under Title VII and ORS § 659A.030**

The substantive analysis for retaliation under Title VII and ORS § 659A.030 is substantially similar, and courts analyze the claims together. *See, e.g.*, *Pullom v. U.S. Bakery*, 477 F. Supp. 2d 1093, 1100 (D. Or. 2007) (noting that "ORS 659A.030 is modeled after Title VII"). Under Title VII, it is "an unlawful employment practice for an employer to discriminate against any of his employees . . . because [the employee] has opposed any practice made an unlawful employment practice by this subchapter." 42 U.S.C. § 2000e-3. ORS § 659A.030(1)(f) makes it unlawful "[f]or any person to discharge, expel or otherwise discriminate against any other person because that other person has opposed any unlawful practice."

To establish a prima facie case of retaliation under both federal and state law, Lindsey must show that: (1) he engaged in a protected activity; (2) CPUD subjected him to an adverse

employment action; and (3) "a causal link exists between the protected activity and the adverse action." *Manatt v. Bank of Am., NA*, 339 F.3d 792, 800 (9th Cir. 2003) (citation omitted). If Lindsey establishes these three elements, the burden shifts to CPUD to articulate its legitimate reasons for the adverse employment action. *Id.* If CPUD makes that articulation, Lindsey then has the burden of showing that CPUD's stated reasons are mere "pretext for a discriminatory motive." *Id.* (citation omitted); *see Snead v. Metro. Prop. & Cas. Ins. Co.*, 237 F.3d 1080, 1090-94 (9th Cir. 2001) (holding that even though Oregon courts do not follow the burden-shifting approach, the Oregon rule is not outcome-determinative, so the burden-shifting framework is appropriate in the Ninth Circuit).

### 1.  Lindsey's Prima Facie Case

CPUD does not dispute that it subjected Lindsey to an adverse employment action by placing him on administrative leave and ultimately terminating his employment. Thus, only the first and third elements of Lindsey's prima facie case are in dispute: whether he engaged in a protected activity and whether a causal link exists between that activity and his termination.

#### a.  Protected Activity

Title VII protects both an "employee's participation in the machinery set up by Title VII to enforce its provisions" and an "employee's opposition to conduct made an unlawful employment practice by the subchapter." *Hashimoto v. Dalton*, 118 F.3d 671, 680 (9th Cir. 1997) (citation omitted). These two parts of Title VII are referred to as "the participation clause" and "the opposition clause." *Id.*

The opposition clause protects "appropriate informal opposition to perceived discrimination" regardless of whether an employer has actually engaged in wrongdoing. *Sias v. City Demonstration Agency*, 588 F.2d 692, 695 (9th Cir. 1978) (citation omitted). Because "elimination of discrimination in employment is the purpose behind Title VII," courts must

interpret the statute liberally. *Id.* Opposition based on the employee's "'reasonable belief' that the employer has engaged in an unlawful employment practice" suffices to show that the employee engaged in protected activity. *Equal Emp. Opportunity Comm'n v. Crown Zellerbach Corp.*, 720 F.2d 1008, 1013 (9th Cir. 1983) (citation omitted); *see also McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 796 (1973) ("[The opposition clause] forbids discrimination against applicants or employees for attempting to protest or correct allegedly discriminatory conditions of employment."); *Moyo v. Gomez*, 32 F.3d 1382, 1385 (9th Cir.) *amended*, 40 F.3d 982 (9th Cir. 1994) ("An erroneous belief that an employer engaged in an unlawful employment practice is *reasonable* . . . if premised on a mistake made in good faith. A good-faith mistake may be one of fact or of law.") (emphasis in original).

Opposition includes more than just active resistance. The U.S. Supreme Court defines "oppose" as "standing pat, say, by refusing to follow a supervisor's order to fire a junior worker for discriminatory reasons." *Crawford v. Metro. Gov't of Nashville & Davidson Cnty., Tenn.*, 555 U.S. 271, 277 (2009). According to the Ninth Circuit, "[o]pposition can, of course, consist of a refusal to carry out an order or policy." *Moyo*, 40 F.3d at 984. In *Moyo*, the Ninth Circuit found that an assertion that the plaintiff refused to carry out or otherwise protested the defendants' alleged policy of discriminating against a protected class was sufficient to withstand summary judgment on a retaliation claim. 40 F.3d at 985.  In the related context of First Amendment retaliation, the Ninth Circuit held that the plaintiff's refusal to pass over an employee for a promotion was protected speech. *Thomas v. City of Beaverton*, 379 F.3d 802, 809 (9th Cir. 2004). Even though the plaintiff did not explicitly tell her supervisor that she believed the supervisor was retaliating against another employee or accuse her supervisor of illegal activity, the plaintiff "may convey an implicit message of disapproval of the illegality of

the activity through her conduct by refusing to facilitate or participate in it." *Id.* The Ninth

Circuit found that this same conduct was sufficient evidence that the plaintiff engaged in

protected opposition under Title VII. *Id.* at 811-12.

Lindsey asserts that he engaged in protected activity by refusing to carry out Booth's

instruction to search Keith's computer and find evidence to "get rid of her." According to

Lindsey, he believed Booth was asking him to help find evidence to discharge an employee

based on her complaints of sexual harassment in the workplace. Lindsey further asserts that he

engaged in protected activity by refusing to wipe Booth's computer and by concealing from

Booth an email concerning a BOLI investigation into sexual harassment and gender

discrimination. According to Lindsey, he told Booth that he would not perform the scrub until he

received a letter from CPUD's legal counsel authorizing the action. Lindsey purportedly refused

to cooperate with Booth because of his good faith belief that Booth's actions contributed to

retaliation and gender discrimination at CPUD.

CPUD responds that Lindsey signed its Employee Acknowledgment Form. According to

CPUD, the form made Lindsey aware of CPUD's computer policy that all computers and email

belonged to CPUD and that CPUD could conduct workplace monitoring and surveillance. CPUD

argues that Lindsey could not have had a reasonable belief that either a search of Keith's

computer or a scrub of Booth's computer was unlawful. Any refusal to conduct the search and

scrub, CPUD argues, was thus not protected activity. Ninth Circuit precedent establishes,

however, that Title VII protects opposition to perceived unlawful employment practices; the

practices need not actually be unlawful. Lindsey asserts that his BOLI training led him to believe

Booth's requests were illegal. Viewed in the light most favorable to the non-moving party,

Lindsey's conduct resembles the actions that the Ninth Circuit characterized as protected activity

in *Thomas*. Lindsey has presented sufficient evidence to allow a reasonable jury to find that he engaged in protected activity by opposing an employment practice that he reasonably believed violated the law.

### b. Causal Link

To show a causal link between an alleged protected activity and an adverse employment action, a plaintiff must show that the protect activity constituted the "but-for cause" of the employer's adverse employment action. *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2533 (2013) ("Title VII retaliation claims must be proved according to traditional principles of but-for causation . . . . This requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer."). Oregon courts use a "substantial factor" test but construe the test as a "but for" standard. *See Hardie v. Legacy Health Sys.*, 167 Or. App. 425, 436 (2000).

A plaintiff may satisfy the causation element through "circumstantial evidence, such as the employer's knowledge that the plaintiff engaged in protected activities and the proximity in time between the protected action and the allegedly retaliatory employment decision." *Yartzoff v. Thomas*, 809 F.2d 1371, 1376 (9th Cir. 1987). For example, in *Yartzoff*, the Ninth Circuit held that sufficient evidence of causation existed where adverse actions occurred less than three months after the plaintiff filed an administrative complaint, two weeks after the charge was first investigated, and less than two months after the investigation ended. *Id.* Timing is not sufficient in all cases; if the temporal proximity is not "very close," evidence other than timing is required to satisfy the causation element. *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) (citing *O'Neal v. Ferguson Constr. Co.*, 237 F.3d 1248, 1253 (10th Cir. 2001)). "[W]here an adverse employment action follows on the heels of protected activity," however, timing alone

suffices to show causation. *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1065 (9th Cir. 2002).

Here, the temporal proximity between the alleged protected activity and adverse employment decision is very close. Lindsey refused either to search Keith's computer or scrub Booth's computer in April 2013. Booth also became aware that Lindsey had concealed the email regarding the BOLI investigation in late April 2013. Booth made the decision to place Lindsey on administrative leave only weeks later on May 7, 2013. Only three days later, on May 10, Booth decided to fire Lindsey.

Lindsey also presents additional evidence supporting the causation element. Booth made statements to both Rakoz and Lindsey regarding his desire to fire employees who engaged in protected activity such as filing BOLI complaints for sexual harassment. Booth admitted that Lindsey's concealment of the Keith email played some role in Booth's decision to terminate Lindsey. Lindsey has presented sufficient evidence to create a genuine issue of material fact concerning causation under the but-for standard. A reasonable jury could find that Lindsey has established a prima facie case of retaliation under both Title VII and ORS § 659A.030.

### c.  Pattern or Practice of Retaliation

Lindsey also puts forward a pattern-or-practice claim. To establish a prima facie case that an employer engaged in a retaliatory pattern or practice, a plaintiff is not required to offer evidence that particular persons were victims of the employer's retaliatory policy. *See Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 360 (1977). It is rather the plaintiff's "burden . . . to establish a prima facie case that such a policy existed." *Id.* The plaintiff must prove that the policy was the employer's "standard operating procedure—the regular rather than the unusual practice." *Obrey v. Johnson*, 400 F.3d 691, 694 (9th Cir. 2005) (quoting *Teamsters*, 431 U.S. at 336). Plaintiffs often establish this standard operating procedure with statistics bolstered by

specific instances of the employer's unlawful conduct. *See, e.g.*, *Teamsters*, 431 U.S. at 338. Once established, an employer's unlawful "pattern is probative of motive" with regard "to the individual employment decision at issue." *Diaz v. Am. Tel. & Tel.*, 752 F.2d 1356, 1363 (9th Cir. 1985).

According to Lindsey, CPUD had a pattern or practice of retaliating against employees who reported sexual harassment by Taffe, who reported retaliation by Booth, or who opposed the targeting and firing of employees who filed sexual harassment complaints with BOLI, EEOC, or the police. Lindsey offers evidence that the employees who reported or opposed Taffe and Booth suffered increased harassment or adverse employment actions. These employees included Rakitnich, Shulda, Blodgett, Rakoz, Keith, Fawcett, and Haas. According to Lindsey, the evidence of a retaliatory pattern or practice helps establish CPUD's retaliatory motive in firing him.

CPUD argues that Lindsey has not established a prima facie case of an unlawful pattern or practice because he offers no statistical evidence. Statistics can be a relevant factor in pattern or practice cases, but such cases "cannot properly be reduced into a mere battle of statistics." *Gay v. Waiters' & Dairy Lunchmen's Union, Local No. 30*, 694 F.2d 531, 552 (9th Cir. 1982). Only in "some cases" will statistical evidence be "essential." *Diaz*, 752 F.2d at 1363. While Lindsey does not present statistics, he does offer details about Booth targeting at least seven other employees who complained about Taffe, cooperated with investigations into Taffe's conduct, or reported Booth's comments about the proceedings.

CPUD also argues that Lindsey cannot establish a pattern or practice of retaliation because none of the employees who complained about Taffe were fired before Lindsey. That the unlawful pattern or practice potentially began with Lindsey is no basis for rejecting his claim at

this stage. Based on the actions taken against other employees involved in the investigations into

Taffe, Lindsey has presented enough evidence to withstand summary judgment on the pattern-or-

practice issue.

### 2. CPUD's Reasons for Terminating Lindsey

The "*McDonnell Douglas* burden shifting framework" applies to retaliation cases brought

in the Ninth Circuit. *McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, 1124 (9th Cir. 2004); *see*

*Snead*, 237 F.3d at 1090-94. If the plaintiff establishes a prima facie case of retaliation, the

burden shifts to the defendant "to articulate some legitimate, nondiscriminatory reason for" its

actions. *McDonnell Douglas Corp.*, 411 U.S. at 802. Only the burden of production shifts; the

plaintiff still carries the burden of persuasion. *Tex. Dep't of Cmty. Affairs v. Burdine*, 450

U.S. 248, 256 (1981); *Yartzoff*, 809 F.2d at 1376. If the defendant offers a legitimate,

nondiscriminatory reason for the employment action, plaintiff must then establish that the reason

is "a pretext or discriminatory in its application." *McDonnell Douglas Corp.*, 411 U.S. at 807.

A plaintiff may prove pretext "either directly by persuading the court that a

discriminatory reason more likely motivated the employer or indirectly by showing that the

employer's proffered explanation is unworthy of credence." *Burdine*, 450 U.S. at 256. For

instance, temporal proximity between protected activity and adverse employment action, coupled

with contemporaneous evidence of the employer's displeasure with the plaintiff, may serve as

"strong circumstantial evidence of retaliation." *Bell v. Clackamas Cnty.*, 341 F.3d 858, 866 (9th

Cir. 2003).

CPUD asserts that Lindsey violated multiple company policies. He purportedly violated

company policies by sending offensive emails and text messages, sharing confidential

information, contracting with a company without authorization, and taking home Booth's and

Throop's hard drives. CPUD argues that these purported policy violations led Booth to lose confidence in Lindsey and provide legitimate, non-retaliatory reasons for Lindsey's discharge.

In support of its argument, CPUD relies on the Ninth Circuit decision in *Pool v. VanRheen*. 297 F.3d 899, 908-09 (9th Cir. 2002). In *Pool*, the plaintiff publicly criticized the county sheriff's office, her employer, for discriminatory practices. According to the sheriff's office, the plaintiff's comments interfered with the supervisor's goal of "improving agency cohesiveness, pursuing an atmosphere of openness and good faith with employees and developing an expectation of leadership by example." *Id.* at 909. The plaintiff's comments also allegedly led her supervisor to lose confidence in the plaintiff's judgment and ability to be an effective employee. *Id.* The Ninth Circuit concluded that the decision to demote the plaintiff in light of these considerations fell "well within the latitude afforded to public employers to maintain effective management" and that no reasonable jury could find that the plaintiff was demoted for retaliatory reasons. *Id.* at 909-11.

Lindsey argues that *Pool* is distinguishable from his case. The plaintiff in *Pool* had voiced concerns about racism and sexism throughout her decades-long career with the sheriff's office and had still attained the rank of Commander. *Id.* at 910-11. In contrast, Booth fired Lindsey within weeks of learning that Lindsey concealed Keith's email and that Lindsey would not assist in obtaining evidence "to get rid" of Keith. The decision to fire Lindsey came rapidly after Lindsey's first instances of purported opposition to his employer's discriminatory and retaliatory practices.

Lindsey further argues that evidence of CPUD's pattern or practice of retaliation undermines the credence of CPUD's proffered explanations for Lindsey's termination. This is a proper use of pattern-or-practice evidence. *See Penk v. Or. State Bd. of Higher Educ.*, 816 F.2d

458, 462 (9th Cir. 1987) ("Proof of general employment policies and practices may be particularly useful in showing pretext."). As discussed above, CPUD argues that Lindsey has not presented evidence sufficient to create an inference that employment decisions were based on an illegal criterion because none of these employees suffered adverse employment actions before Lindsey. The actions taken against other employees involved in complaints against Taffe does, however, serve as circumstantial evidence that CPUD's reasons for firing Lindsey were pretextual. The harsh disciplinary actions taken against the other employees who opposed sexual harassment by Taffe and retaliation by Booth—particularly when viewed in contrast with the relatively light disciplinary actions taken against Taffe himself—provide evidence of a general policy of retaliation of which Lindsey's termination may have been a part.

CPUD's same-actor theory is also unavailing. The Ninth Circuit has articulated "the principle that an employer's initial willingness to hire the employee-plaintiff is strong evidence that the employer is not biased against the protected class to which the employee belongs." *Coghlan v. Am. Seafoods Co. LLC*, 413 F.3d 1090, 1096 (9th Cir. 2005). Similarly, where the same supervisor both promotes and terminates an employee within a period of several months, the same-actor theory may refute an employee's pretext argument. *Reid v. Evergreen Aviation Ground Logistics Enters. Inc.*, 2009 WL 136019, at *11 (D. Or. Jan. 20, 2009). These cases, however, are based on the idea that it is "simply incredible" to argue that an employer willing to hire or promote a member of a protected group will suddenly develop an aversion to that group. *Bradley v. Harcourt, Brace & Co.*, 104 F.3d 267, 271 (9th Cir. 1996) (quoting *Lowe v. J.B. Hunt Transp., Inc.*, 963 F.2d 173 (8th Cir.1992)). Lindsey points out that his alleged protected activity occurred between his last promotion and his termination, creating a retaliatory motive that did not exist at the time Booth promoted Lindsey. The same-actor theory thus does not apply to the

circumstances of this case. Lindsey has presented sufficient evidence to create a genuine issue of material fact concerning the true reasons for his termination. A jury must decide this question.

**B.  Whistleblower Claims under ORS § 659A.203 and ORS § 659A.199**

ORS § 659A.203 forbids a public employer from "[p]rohibit[ing] any employee from disclosing, or tak[ing] or threaten[ing] to take disciplinary action against an employee for the disclosure of any information that the employee reasonably believes is evidence of," among other things, "[a] violation of any federal or state law" or "[m]ismanagement, gross waste of funds or abuse of authority or substantial and specific danger to public health and safety resulting from action of the state, agency or political subdivision." The statute also prohibits public employers from attempts to "[d]iscourage, restrain, dissuade, coerce, prevent or otherwise interfere with disclosure or discussions described in this section." ORS § 659A.199 provides that an employer may not "retaliate against an employee . . . for the reason that the employee has in good faith reported information that the employee believes is evidence of a violation of a state or federal law, rule or regulation."

To establish a prima facie case under either statute, "a plaintiff must show that he (1) engaged in a protected activity, (2) suffered an adverse employment decision, and (3) there was a causal link between the protected activity and the adverse employment decision." *Neighorn v. Quest Health Care*, 870 F. Supp. 2d 1069, 1102 (D. Or. 2012); *Shepard v. City of Portland*, 829 F. Supp. 2d 940, 965 (D. Or. 2011).

**1.  "Disclosures" under ORS § 659A.203**

As a threshold matter, the Court must decide whether Lindsey's reports to Booth regarding the computer search and scrub constitute "disclosures" and thus could potentially qualify as protected activity under ORS § 659A.203. In *Bjurstrom v. Oregon Lottery*, the Oregon Court of Appeals held that "disclosure" under the whistleblower protection statute includes a

report made within an agency or a department. 202 Or. App. 162, 169-70 (2005) (holding that ORS § 659A.030 does not "limit the protected actions to extra-agency disclosures of wrongdoing"). The court in *Bjurstrom* did conclude, however, that the term "disclosure" is subject to certain limitations when viewed in light of the legislature's intent that "the reported activity must rise in magnitude to a level of public concern in order for complaints about it to be protected." *Id.* at 172.  For example, a "disclosure" does not include "a reaction to an apparently routine employment process, the results of which plaintiff did not approve." *Id.* at 174. A "disclosure" also does not include criticisms of "a temporary error." *Id.*

CPUD argues that ORS § 659A.203 also requires that the "disclosure" be made to someone other than the alleged wrongdoer. In *Clarke v. Multnomah County*, the court found that "disclosure" did not include "reporting bad conduct to the bad actor" because "the employee did not reveal anything new." 2007 WL 915175, at *16 (D. Or. Mar. 23, 2007). In the absence of guidance from Oregon courts, the court in *Shultz v. Multnomah County* looked to the similarly-worded federal Whistleblower Act of 1989 ("WPA"), 5 U.S.C. § 2302, in interpreting "disclosure" under ORS § 659A.203. 2009 WL 1476689, at *13-14 (D. Or. May 27, 2009). The *Shultz* court found the Federal Circuit's interpretation of "disclosure" persuasive. The Federal Circuit held "that complaints to a supervisor about the supervisor's own conduct are not disclosures covered by the WPA, but that complaints to a supervisor about other employees' conduct or other misconduct may be disclosures covered by the WPA." *Huffman v. Office of Pers. Mgmt.*, 263 F.3d 1341, 1344 (Fed. Cir. 2001). Guided by *Huffman*'s interpretation of the WPA, the *Shultz* court concluded, "for disclosure to constitute protected activity . . . , it must be made to someone other than the wrongdoer." 2009 WL 1476689, at *14.

Cases also suggest that "disclosure" only extends to reports of previously unavailable information. In affirming the decision regarding the district court's interpretation of ORS § 659A.203 in *Clarke*, the Ninth Circuit stated: "The plain language of the Oregon statute . . . confirms that merely reporting publicly available information does not constitute a protected 'disclosure' . . . . We are confident that the Oregon courts would agree with this interpretation." *Clarke*, 303 F. App'x 512, 513 (9th Cir. 2008).

Relatedly, to qualify as a "disclosure" a report must do more than alert a wrongdoer that his conduct is unlawful. In *Huffman*, the case relied upon by the court in *Shultz*, the Federal Court reasoned:

> To be sure, there may be situations where a government employee reports to the wrongdoer that the conduct of the wrongdoer is unlawful or improper, and the wrongdoer, though aware of the conduct, was unaware that it was unlawful or improper. Nonetheless, the report would not be a protected disclosure. It is clear from the statute, 5 U.S.C. § 2302(b)(8)(A), that the disclosure must pertain to the underlying conduct, rather than to the asserted fact of its unlawfulness or impropriety, in order for the disclosure to be protected by the WPA.

*Huffman*, 263 F.3d at 1350 n.2 (Fed. Cir. 2001). The court in *Hutton v. Jackson County* similarly stated: "In plain English, the disclosure must reveal previously unknown conduct in order to be protected activity; it is insufficient to merely identify or label conduct which is known to have occurred as either unlawful or improper." *Hutton v. Jackson Cnty.*, 2010 WL 4906205, at *9 (D. Or. Nov. 23, 2010), *aff'd*, 472 F. App'x 568 (9th Cir. 2012).

In support of his whistleblower claim, Lindsey points to *Bjurstrum* court's statement concerning reading limitations into the statute:

> [The statute] protects 'disclosure' without limitation, and [courts] must not add limitations that the legislature has omitted. ORS 174.010. In addition, ORS 659A.221(2), also part of the Whistleblower Law, explicitly authorizes the public employer to establish rules requiring the whistleblower to report wrongdoing to immediate supervisors first, but in those circumstances, 'the employer must protect the employee against retaliatory or disciplinary action.'

202 Or. App. at 169.[2] As emphasized in *Clarke*, however, the dictionary definition of "disclose" is to provide "information that was not already publicly known." 303 F. App'x at 513 (citing the definitions in *Black's Law Dictionary* 497 (Garner 8th ed. 2004) ("The act or process of making known something that was previously unknown; a revelation of facts."), 4 *Oxford English Dictionary* 737 (2d ed. 1989) (". . . To open up to the knowledge of others; to make openly known, reveal . . . ."), and *Webster's Ninth New Collegiate Dictionary* 360 (1984) ("[T]o expose to view . . . to make known or public.")).

Lindsey cites to a statement from the opinion of another court in this district regarding possible limitations on the reasoning in *Clarke*. That court was "not persuaded that the Oregon courts would adopt the analysis in *Clarke*, as it arguably conflicts with the Oregon Court of Appeals' discussion of the whistleblower statute in *Bjurstrom*." *Reynolds v. City of Eugene*, 937 F. Supp. 2d 1284, 1296 (D. Or. 2013), *aff'd in part, rev'd in part and remanded*, 599 F. App'x 667 (9th Cir. 2015). The *Reynolds* court pointed out that *Bjurstrom* did not compare ORS § 659A.203 to the WPA, as did the courts in *Clarke*, *Shultz*, and *Hutton*. The court acknowledged, however, that "*Bjurstrom* does not explicitly address disclosures to supervisors

---

[2] At oral argument, Lindsey argued that ORS § 659A.221(2) indicates that the Oregon legislature did not intend to exclude from whistleblower protection a report of bad conduct to the bad actor. Such an exclusion, argues Lindsey, would allow a supervisor to retaliate against an employee who was forced to first bring a complaint against a supervisor to that supervisor's attention. The statutes provides: "A public employer may establish by rule an optional procedure whereby an employee who wishes to disclose information described in ORS 659A.203(1)(b) may disclose information first to the supervisor, or if the supervisor is involved, to the supervisor next higher, but the employer must protect the employee against retaliatory or disciplinary action by any supervisor for such disclosure." If an immediate supervisor is involved in wrongdoing, the employee may report that wrongdoing to the next higher supervisor. Limiting "disclosure" to reports made to someone other than the wrongdoer will thus not inhibit an employee's ability to obtain whistleblower protection for reports of a supervisor's unlawful conduct.

who are also the alleged wrongdoers." *Id.*  Ultimately, the *Reynolds* court declined to rule on whether "disclosures" included reports of wrongdoing made only to the alleged wrongdoer.

As discussed above, the *Bjurstrom* court found some limitations on whistleblower protection to be inherent in the text of ORS § 659A.203. Additionally, the *Bjurstrom* court stressed that that the Oregon legislature intended to protect only activity that "rise[s] in magnitude to a level of public concern." 202 Or. App. at 172. The common usage of "disclose" suggests that alerting a wrongdoer that his own conduct is unlawful does not fall under the protection of ORS § 659A.203. Nothing in the sparse legislative history of the statute suggests that this definition of "disclose" places activity of public concern beyond protection or that the Oregon legislature intended a different result.

Lindsey asserts that his disclosures included reports of violations of ORS § 162.325 ("hindering prosecution"), ORS § 162.235 ("obstructing governmental or judicial administration"), and ORS § 162.295 ("tampering with physical evidence"). He asserts that he made these disclosures by reporting to Booth that, based on his BOLI training, he believed scrubbing Booth's computer would violate the law. According to Lindsey, without a letter from counsel, he refused to perform the scrub. Lindsey also purportedly told Booth that a blanket search of Keith's computer was illegal. Lindsey never asserts, however, that he told Booth which laws he believed Booth's requests violated. Additionally, Lindsey never asserts that he threatened to report Booth's conduct to a third party or that a third party was present when Lindsey made the reports to Booth. The Court thus reaches this narrow holding: Lindsey's report to Booth that Booth's own conduct was unlawful, without threatening to reveal Booth's conduct to anyone else, is not a "disclosure" under ORS § 659A.203 and thus cannot be protected activity. Lindsey has not established a prima facie case under the statute.

### 2.  Applicability of ORS § 659A.199

The parties do not provide, and the Court has been unable to find, any Oregon appellate

decision addressing the question whether a plaintiff may bring claims under both ORS

§ 659A.203 and ORS § 659A.199 against the same employer. This Court, however, has

concluded on multiple occasions that "[t]he Oregon legislature enacted ORS § 659A.199 in 2009

to extend 'whistleblowing' protections to private sector employees." *Neighorn*, 870 F. Supp. 2d

at 1101 (D. Or. 2012); *see Peters v. Betaseed, Inc.*, 2012 WL 5503617, at *4 (D. Or. Nov. 9,

2012) (distinguishing between ORS § 659A.203, "which applies to public employers," and ORS

§659A.199, under which the plaintiff properly brought a claim against a private employer);

*Grosz v. Farmers Ins. Exch.*, 2010 WL 5812667, at *7 (D. Or. Nov. 9, 2010), *report and

recommendation adopted*, 2011 WL 587555 (D. Or. Feb. 10, 2011) (noting that ORS § 659A.199

"impose[s] liability for whistleblowing discrimination by private employers").

The legislative history of ORS § 659A.199 evinces the legislature's intent to make

whistleblower protections available in the private sector. When Representative Judy Steigler

introduced the bill that would become ORS § 659A.199 to the Oregon House of Representatives,

she explained:

> Essentially, what House Bill 3162 accomplishes is putting private employees on
> equal footing with public employees at this stage of the game who already have a
> whistle-blowing provision in ORS 659A . . . . [M]y main motivation here was to
> provide the private employee who was trying to do the right thing the same rights
> and remedies that are available to our public employees.

*Hearing on H.R. Bill 3162A before the H. Comm. on Business and Labor*, 75th Legis. Assemb.

(Or. 2009) (statement of Rep. Judy Steigler). When presenting the bill to the Oregon Senate

Committee on Commerce and Workplace Development, Representative Steigler similarly stated:

"So what this proposes to do—it's really quite a simply bill . . . . All this basically does is . . .

bring private employees more in line with the remedies available to them—would be available to

them as public employees." *Hearing on H.R. Bill 3162A before the S. Comm. on Commerce and Workforce Development*, 75th Legis. Assemb. (Or. 2009) (statement of Rep. Judy Steigler).

CPUD is a public employer. The legislative history establishes that ORS § 659A.199 does not apply to public employers. Lindsey thus cannot bring a claim against CPUD under that statute.

## C. Common Law Wrongful Discharge Claim

Lindsey asserts a common law wrongful discharge claim for his reports and opposition to unlawful conduct. CPUD asks the Court to decide the oft-raised issue of whether a plaintiff who alleges the interstitial tort of common law wrongful discharge is precluded from bringing that claim because there is an adequate statutory remedy. Under Oregon law, a claim for common law wrongful discharge is not available if "(1) an existing remedy adequately protects the public interest in question, or (2) the legislature has intentionally abrogated the common law remedies by establishing an exclusive remedy (regardless of whether the courts perceive that remedy to be adequate)." *Arnold v. Pfizer, Inc.*, 970 F. Supp. 2d 1106, 1145-46 (D. Or. 2013) (citation omitted); *see Wall v. Sentry Ins.*, 2015 WL 350683, at *3 (D. Or. Jan. 26, 2015) (holding that the test for preclusion of a common law wrongful discharge claim is disjunctive).

When a court decides whether an adequate statutory remedy exists, "the question . . . is not whether the existing remedy is 'the best possible remedy' or 'identical to the tort remedy' but merely whether it is sufficient to 'adequately protect the employment related right.'" *Gahano v. Sundial Marine & Paper*, 2007 WL 4462423 at *15 (D. Or. Dec. 14, 2007), *adhered to on reconsideration*, 2008 WL 185793 (D. Or. Jan. 17, 2008) (quoting *Draper v. Astoria Sch. Dist. No. 1C*, 995 F. Supp. 1122, 1134 (D. Or.1998)). Title VII includes remedies for compensatory damages, including "emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses." 42 U.S.C. § 1981a(b)(3). ORS § 659A.885

specifies that ORS § 659A.030 allows a court to "order injunctive relief and any other equitable relief that may be appropriate, including but not limited to reinstatement or the hiring of employees with or without back pay." Based on Ninth Circuit precedent, this Court has previously held that Title VII and ORS § 659A.030 provide adequate statutory remedies such that a common law wrongful-discharge claim based on retaliation is not available. *Gahano*, 2007 WL 4462423, at *14 (citing *Thomas*, 379 F.3d at 802).

Lindsey bases his common law wrongful discharge claim on some of the same conduct for which he asserts Title VII and ORS § 659A.030 claims: alerting Booth of Lindsey's belief that scrubbing Booth's computer would violate the law. Lindsey's alleged report to Booth resembles the conduct of the plaintiff in *Thomas v. City of Beaverton*, where the Ninth Circuit found the plaintiff's retaliation claims precluded her common law wrongful discharge claim. 379 F.3d at 813. In *Thomas*, the plaintiff refused to document incidents and problems involving an African-American employee because the plaintiff thought such targeted monitoring was unfair. *Id.* at 806. After interviewing the same employee for a promotion, the plaintiff's supervisor instructed the plaintiff not to promote the employee. The plaintiff expressed disagreement with this decision and said she could not justify failing to promote the employee. *Id.* at 806-07. The plaintiff was fired soon after this interaction with her supervisor. *Id.* at 807. The plaintiff's conduct was sufficient evidence of opposition to unlawful conduct but not "the kind of personal injury that would warrant providing a common law remedy of wrongful discharge in addition to the existing state and federal statutory remedies for retaliation." *Id.* at 813. Lindsey presents no argument regarding why the Court should reach a different conclusion in this case. The Court thus finds that Title VII and ORS §659A.030 provide adequate statutory remedies and preclude Lindsey's common law wrongful discharge claim.

As to Lindsey's whistleblower claims, he argues that the text of ORS § 659A.199(2) makes it clear that the statute allows for both statutory and common law remedies: "The remedies provided by this chapter are in addition to any common law remedy or other remedy that may be available to an employee for the conduct constituting a violation of this section." This Court has previously found that a common law wrongful discharge claim provides the same remedies as a whistleblower claim under ORS § 659A.199 and that the two claims cannot be pursued simultaneously. *Duran v. Window Products, Inc.*, 2010 WL 6420572, at *5 (D. Or. Dec. 22, 2010), *report and recommendation adopted*, 2011 WL 1261190 (D. Or. Mar. 29, 2011) ("ORS 659A.199 provides an adequate (if not better) remedy [than a common law wrongful discharge claim]."). Regardless, as discussed above, the Court grants summary judgment on Lindsey's claim under ORS § 659A.199, making the text of that statute irrelevant to the question whether Lindsey has an adequate statutory remedy. The Court concludes that adequate statutory remedies exist for Lindsey's surviving claims of retaliation under Title VII and ORS § 659A.030, and Lindsey's common law wrongful discharge claim is thus precluded.

## D.  Defendant's Motions to Strike

CPUD objects to 19 separate documents presented by Lindsey and moves the Court to strike the documents from the summary judgment record. A motion to strike "is a drastic remedy," and as a general rule, courts view such motions "with disfavor." 5C Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1380 (3d ed. 1969); *see Stabilisierungsfonds Fur Wein v. Kaiser Stuhl Wine Distribs. Pty. Ltd.*, 647 F.2d 200, 201 (D.C. Cir. 1981).

The Court has reviewed the evidence and the parties' arguments under the appropriate summary judgment standard. The Court did not consider inadmissible evidence in deciding CPUD's motion for summary judgment. At this time, the Court overrules all hearsay and

hearsay-within-hearsay objections made by CPUD under Federal Rules of Evidence 801, 802, and 805, having considered the statements only for their effect on CPUD's representatives. CPUD's other objections under Federal Rules of Evidence 401, 402, and 403 are duplicative of the summary judgment standard. *See Burch v. Regents of the Univ. of Cal.*, 433 F. Supp. 2d 1110, 1119 (E.D. Cal. 2006) (noting that "objections to evidence on the ground that it is irrelevant, speculative, and/or argumentative, or that it constitutes an improper legal conclusion are all duplicative of the summary judgment standard itself"). The Court overrules the objections at this stage of the proceedings. CPUD may renew its objections to the evidence in its pretrial motions *in limine*.

## CONCLUSION

CPUD's Motion for Summary Judgment (Dkt. 23) is GRANTED IN PART and DENIED IN PART. The motion is granted with respect to Lindsey's claims of religious discrimination, public employer whistleblower retaliation under ORS § 659A.203, whistleblower retaliation under ORS § 659A.199, and wrongful discharge in violation of public policy. These claims are dismissed. CPUD's Motion for Summary Judgment is denied with respect to Lindsey's claims of retaliation under Title VII of the Civil Rights Act of 1964 and retaliation under ORS § 659A.030. CPUD's Motion to Strike, contained in its Reply in Support of Motion for Summary Judgment (Dkt. 32), is DENIED.

**IT IS SO ORDERED**.

DATED this 23rd day of October, 2015.

/s/ Michael H. Simon
Michael H. Simon
United States District Judge